ACCEPTED
01-13-00931-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/13/2015 12:11:55 PM
CHRISTOPHER PRINE
CLERK

No. 01-13-00931-CR

| | | |
|---|---|---|
| **MELISSA DROMGOOLE,** | § | **IN THE COURT OF APPEALS FOR** |
| **Appellant** | § | |
| | § | |
| **v.** | § | **THE FIRST DISTRICT OF TEXAS** |
| | § | |
| **THE STATE OF TEXAS,** | § | |
| **Appellee** | § | **HOUSTON, TEXAS** |

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/13/2015 12:11:55 PM
CHRISTOPHER A. PRINE
Clerk

## APPELLANT'S AMENDED MOTION FOR REHEARING

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

**APPELLANT, MELISSA DROMGOOLE,** by and through the

undersigned counsel, submits this amended motion for rehearing pursuant to Texas

Rules of Appellate Procedure 49.1 and 49.6, and requests that the Court reconsider

its opinion of June 4, 2015, for the reasons set out below.

### I. The Opinion Misstates Facts Relevant to Issue One

In Issue One, Appellant claims that the blood draw was unreasonable under

the Fourth Amendment because Appellant disclosed to the arresting officer that she

had a medical condition, syncope, which put the officer on notice that a blood draw

could present medical complications. The Court's opinion acknowledges that

Appellant explained to Officer Nunn that, with her syncope, her "blood pressure

drops and then [she] faints." (Slip Op. at 18). But the Court rejected the claim

1

because Appellant's doctor testified that Appellant does not have low blood pressure; thus, the Court held that "a warning of low blood pressure would not have conveyed appropriate information to prevent an unreasonable blood draw." (Slip Op. at 19).

This is a misstatement or gross oversimplification of the facts. As set out in Appellant's Brief, Dr. Joseph Varon, who diagnosed Appellant's syncope several years prior to the DWI arrest, testified that syncope is the medical term given to fainting and is often caused by temporary low blood pressure during a change of body position. 9RR91-93; Appellant's Brief at 7-8.

When asked to explain the relationship between blood pressure and syncope, Dr. Varon testified that those prone to syncope "tend to have a low blood pressure at some point in time," usually, when "you change positions abruptly." 9RR92-93. Dr. Varon explained that in vasovagal syncope a change of position causes a change in blood pressure. 2RR89. Varon further explained that in healthy people the body responds to low blood pressure with a compensatory increase in heart rate, but this compensatory reaction does not function properly for Appellant. 2RR111. When the heart does not "pump enough blood fast enough to the rest of your body", syncope results. 2RR120. Accordingly, the Court's opinion misstates and oversimplifies the facts in finding that Appellant's syncope "does not affect her blood pressure." (Slip

2

op. at 19).

Moreover, Appellant did not merely provide a "warning of low blood pressure" to Officer Nunn, as stated in the opinion. (Slip Op. at 19). Appellant told Officer Nunn: "I just have syncope, which is when my blood pressure drops and then I faint." SX4 (2:50:30-40). She disclosed the appropriate medical term for her condition and further explained that the fainting occurs when her blood pressure "drops." Her explanation is consistent with Dr. Varon's testimony explaining the relationship between blood pressure and syncope. Requiring a more detailed explanation of the relationship between blood pressure and syncope places an unreasonable burden on a citizen in this context, as does subjecting Appellant's choice of words to this level of scrutiny.

This Court's opinion also misstates the facts in rejecting Appellant's assertion that Officer Nunn had a duty to report Appellant's disclosed medical condition to the blood draw nurse. The Court found that, even assuming such a duty exists, "there is no evidence in the record that the term syncope should have alerted a reasonable person authorized to perform a blood draw about any increased medical risk in performing a blood draw." (Slip Op. at 21).

As stated in Appellant's Brief (at 10-11), Dr. Varon testified that it is not reasonable to perform a blood draw on a person prone to syncope or low blood

3

pressure in the standard sitting position; the patient should be lying flat. 2RR102, 116-117. Dr. Varon also testified that blood pressure should be measured in conjunction with a blood draw for a patient prone to syncope or low blood pressure. 2RR117-119. There was no evidence contrary to Dr. Varon's testimony on this issue. Accordingly, the record establishes that both the term syncope and a report of low blood pressure should have alerted a person authorized to draw blood to a risk of complications.

Appellant requests that the Court reconsider its disposition of Issue One in light of these undisputed facts.

**II. The *Reynolds* Test is Inapplicable in the Context of Blood Analysis.**

In Issue Four, Appellant asserts that the blood test evidence was unreliable under Texas Rule of Evidence 702 and the non-exclusive multi-factor analysis described in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). The Court held that this was not the appropriate standard and instead applied the modified standard announced in *Reynolds v. State*, 204 S.W.3d 386, 390 (Tex. Crim. App. 2006), namely, whether the technique was properly applied in accordance with the rules of DPS. (Slip Op. at 28-29). Appellant asserts that the *Reynolds* test is not applicable in this context for the following reasons.

*Reynolds* involved a challenge to the admissibility of the analysis of a breath

test. The Court of Criminal Appeals rejected the appellant's contention that, consistent with *Kelly*, the proponent of evidence of the results of a breath alcohol testing apparatus must show that the operator of the apparatus has a ready grasp of the sort of information he was required to know in order to become certified as an operator in the first place. *Id.* at 390. The Court held that in the context of breath test results, the Legislature has already determined that the underlying science is valid, and that the technique applying it is valid as long as it is administered by individuals certified by, and using methods approved by the rules of, DPS. *Id.* The Court cited as authority § 724.064 of the Transportation Code, which states that evidence of alcohol concentration shown by a breath, blood, or urine test is admissible in a prosecution under Chapter 49 of the Penal Code. *Id.,* n. 26. But the Court also cited two cases involving the legislative determination of reliability for intoxilyzer testing, *id.*, and expressly limited its modified standard to *Kelly* hearings "at which the results of a breath test are challenged." *Id.* at 390-91.

Moreover, while there is a comprehensive set of DPS rules regarding breath testing, there is no equivalent regulatory scheme for blood testing. For example, the Transportation Code provides that a "breath specimen taken at the request or order of a peace officer must be taken and analyzed under rules of the department"; and "[t]he department may . . . adopt rules approving satisfactory analytical methods;

and . . . ascertain the qualifications of an individual to perform the analysis." TEX. TRANSP. CODE ANN. § 724.016(a) (Vernon 2011). Title 37, Chapter 19 of the Texas Administrative Code, titled "Breath Alcohol Testing Regulations," provides that all Texas agencies must perform their breath tests under an approved breath test program. See 37 TEX. ADMIN. CODE § 19.4(a), (b)(3), (f)(6). The chapter provides detailed rules for instrument certification, testing techniques and methods, operator certification, Technical Supervisor certification, and approval of instruction courses. *See* 37 TEX. ADMIN. CODE § 19.2 *et seq.*

The only DPS regulation pertaining to blood alcohol analysis is a general requirement that a crime lab performing such analysis for use in a criminal proceeding be accredited by DPS, which is accomplished by providing DPS with documentation showing that the lab is accredited by one of several recognized accrediting bodies. *See* TEX. GOV'T CODE § 411.0205; TEX. CODE CRIM. PROC. art. 38.35; 37; TEX. ADMIN. CODE § 28.141 *et seq.* Thus, under the modified *Reynolds* test, the only way blood analysis could be conducted in violation of DPS rules is if the lab performing the analysis was not properly accredited. This standard is not adequate to determine the reliability of the analysis of a particular specimen.

Accordingly, the *Reynolds* test is not an appropriate substitute for the standard *Kelly* analysis in the context of a reliability challenge to blood alcohol

6

testing. Appellant requests that the Court reconsider Issue Four in light of the multi-factor analysis from *Kelly*, as argued in Appellant's Brief.

**III. The Deviation from Validated Parameters Violated DPS Rules**

The opinion states that the "burden of establishing that the technique was properly applied in accordance with the rules of DPS includes considering challenges to the performance of tests designed to ensure scientific equipment is functioning properly prior to the use of the equipment." (Slip. Op. at 35). The opinion does not cite or mention any particular DPS rule in conjunction with this analysis. The Court appears to conclude that DPS rules implicitly encompass the standards of the recognized accrediting body of the lab. As noted above, a crime lab analyzing evidence for use in a criminal case must be accredited by DPS, and to obtain DPS accreditation a lab must first be accredited by a recognized accrediting body. Accordingly, the standards of the recognized accrediting body could be understood as creating a baseline for compliance with DPS rules. If the modified *Reynolds* test is applicable, and if DPS rules are presumptively coextensive with the standards of the recognized accrediting body, Appellant asserts that the record establishes that the blood analysis was conducted in violation of DPS rules.

When asked whether DPS rules allow deviation from validated methods, HPD Crime Lab Director Irma Rios testified, "What the Department of Public

Safety does is they recognize the accrediting bodies and we have to be accredited by those bodies and there are certain standards we have to follow." 7RR196. All four experts (Irma Rios, Laura Mayor, Will Arnold, and Amanda Culbertson) testified that the standards of the accrediting agency, the American Society of Crime Lab Directors/Laboratory Accreditation Board (ASCLD/LAB), require case work to be conducted in accordance with the validated method established for an instrument. 6RR129; 7RR13-14, 19-20, 24; 61; 92; 134; 155; 188; 191-92; 196-97; 8RR159. Mayor, Culbertson, and Rios testified that the use of controls and standards is not a substitute for proper validation. 7RR62; 156; 189; 191; 201-02. None of the State's experts provided evidence demonstrating that ASCLD/LAB standards permitted forensic analysis to be conducted while deviating from validated parameters, either generally or specifically with respect to changes in the vial oven temperature. 7RR90; 8RR136; 8RR188-89. While the State's experts opined that the deviation in this case did not render the analysis of Appellant's specimen unreliable, there was no evidence that the practice of conducting forensic analysis using non-validated parameters complied with ASCLD/LAB standards.

Assuming DPS rules are coextensive with the standards of the recognized accrediting body, the record demonstrates that the deviation from the validated method in this case violated DPS rules. Whether the challenged evidence was

otherwise reliable, notwithstanding the violation, is not at issue; "the only determination for a trial court to make in the *Kelly* hearing is 'whether the technique was properly applied in accordance with the rules of DPS on the particular occasion in question.' " (Slip. Op. at 29, citing *Reynolds*, 204 S.W.3d at 390); *see also Schultz v. State*, 457 S.W.3d 94, 104 & n.4 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (declining to address issue of whether any deviation from DPS rules results in a per se determination of unreliability). Pursuant to the *Reynolds* analysis, Issue Four should be sustained.

Alternatively, if violation of DPS rules does not result in a per se determination of unreliability, Appellant asserts that the question of whether the violation resulted in unreliability should be analyzed in light of the non-exclusive *Kelly* factors. *Id.*, 104 & n. 4 (declining to address issue of whether the particular deviation required a determination of unreliability).

### IV. The Burden of Proving Reliability
### Remains on the Proponent of Scientific Evidence

Appellant asserts that the Court erred in holding that if the State demonstrates that the testing equipment was functioning properly, the burden then shifts to the defendant "to establish that the evidence was otherwise unreliable," pursuant to *Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005). (Slip Op. at 29-30).

In *Pham* the Court held that a defendant moving to suppress evidence

pursuant article 38.23 of the Texas Code of Criminal Procedure has the burden to demonstrate a causal connection between the law violation and the acquisition of the evidence. *Id.* at 773. In so doing, the Court cited two cases, both of which dealt with the burden of proof in a motion to suppress challenging an illegal search or seizure. *Id.,* citing *Mattei v. State*, 455 S.W.2d 761, 766 (Tex. Crim. App. 1970); *Russell v. State,* 171 S.W.2d 7, 9 (Tex. Crim. App. 1986). There is no indication in *Pham* that the Court intended to change or shift the burden of proof in a reliability challenge pursuant to Texas Rule of Evidence 702. In fact, the Court of Criminal Appeals recently clarified that in this context "[o]nce the party opposing the evidence objects ... the proponent bears the burden of demonstrating its admissibility." *State v. Esparza*, 413 S.W.3d 81, 86 (Tex. Crim. App. 2013); quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995); *see also Sexton v. State*, 93 S .W.3d 96, 100 (Tex. Crim. App. 2002) ("[t]he proponent of scientific evidence bears the burden of proving to the trial court, by clear and convincing evidence, that the evidence is sufficiently relevant and reliable to assist the jury in determining a fact in issue"); *Kelly*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

No other court of appeals has applied *Pham* to shift the burden in the context of a reliability challenge under Rule 702. Appellant respectfully requests that the

Court reconsider its disposition of Issue Four with the burden of proof remaining on the State, as the proponent of the scientific evidence, to demonstrate by clear and convincing evidence that the blood alcohol analysis was sufficiently reliable. Specifically, Appellant asserts that the Court misplaced the burden in requiring defense expert testimony that would "disprove as a matter of law Arnold's testimony that the ratio of alcohol to n-Propanol would remain constant after increasing the temperature of the vial oven." (Slip op. at 36). Instead, the proper analysis is, as argued in Appellant's Brief, whether the State met its burden of demonstrating clear and convincing evidence of reliability by providing some objective, independent validation of the expert's methodology beyond the expert's mere assurances or bare opinions. *See, e.g., Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir.1998); *Coble v. State*, 330 S.W.3d 253, 277 (Tex. Crim. App. 2010); *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999).

## V. The Court's Reliance on Henry's Law is Misplaced.

In resolving Issue Four, the Court relied on Henry's Law, as described by the State's experts, as definitive proof that a change in the vial oven temperature would not affect the reliability of the instrument used to test Appellant's blood specimen. The Court noted that, according to Henry's Law, in a closed environment (such as the sealed vial) with a constant temperature, the volume of volatile compounds

11

(such as alcohol and n-Propanol) in a liquid will be proportional to the concentration of those compounds in the liquid. The Court found that, in light of Henry's Law, the ratio of alcohol to n-Propanol would remain constant after increasing the temperature of the vial oven. (Slip Op. at 32-36). This analysis, however, dodges the critical issue: whether the State sufficiently demonstrated that this particular instrument was reliable at certain settings.

Scientific principles such as Henry's Law are dependent on certain variables. As noted by the Court, "Henry's Law is based on a fixed, constant temperature." Accordingly, one of the purposes of conducting a validation study on a particular instrument at designated parameters is to affirmatively demonstrate that the instrument is capable of maintaining a fixed, constant temperature at those settings. In a perfect world in which all machines always functioned perfectly, Henry's Law would play out predictably. But because performance varies from one instrument to another, a validation study is required to prove that the machine performs adequately at the defined parameters.

The Court found that "[n]othing in Culbertson's testimony disproved as a matter of law Arnold's testimony that the ratio of alcohol to n-Propanol would remain constant after increasing the temperatu,re of the vial oven." (Slip Op. at 36). But the issue is not the validity of Henry's Law, but rather whether the State

12

demonstrated that the instrument itself was reliable. This is not merely "a resolution of conflicting evidence between experts" (Slip Op. at 36), because any opinion regarding the accuracy of the instrument would be pure speculation in the absence of a validation study at designated parameters.

Appellant requests that the Court reconsider its resolution of Issue Four, with recognition of the fact that the application of Henry's Law presupposes a properly functioning instrument. Accordingly, Henry's Law has no relevance to the issue of whether the State demonstrated reliability.

**WHEREFORE, PREMISES CONSIDERED,** Appellant respectfully requests that the Court grant rehearing.

**Respectfully submitted,**

/s/ Norman J. Silverman
Norman J. Silverman
T.B.C. No. 00792207
917 Franklin, 4th Floor
Houston, Texas 77002
(713) 526-1515
(713) 526-1798 (FAX)
Attorney for Appellant

**CERTIFICATE OF SERVICE**

This document has been served on the following parties electronically through the electronic filing manager contemporaneously and in conjunction with e-filing on July 13, 2015.

Carly Dessauer
dessauer_carly@dao.hctx.net
Alan Curry
curry_alan@dao.hctx.net

/s/ Norman J. Silverman

**CERTIFICATE OF COMPLIANCE**

This document has been prepared with Microsoft Word 2010, and the sections covered by Texas Rule of Appellate Procedure 9.4 (i) (1) contain **2,763** words according to the program's word-count function.

/s/ Norman J. Silverman