PD-1230-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/19/2015 5:52:39 PM
Accepted 10/20/2015 4:24:21 PM
ABEL ACOSTA
CLERK

## No. PD-1230-15

**In the**
**Court of Criminal Appeals**
of Texas

_____

**MELISSA DROMGOOLE,**
**Appellant**
v.
**THE STATE OF TEXAS,**
**Appellee**

_____

**From the Court of Appeals**
**For the First Judicial District of Texas**
**Houston, Texas**
**No. 01-13-00931-CR**

_____

**PETITION FOR DISCRETIONARY REVIEW**

_____

FILED IN
COURT OF CRIMINAL APPEALS

October 20, 2015

ABEL ACOSTA, CLERK

**NORMAN J. SILVERMAN**
**T.B.C. No. 00792207**
**917 Franklin, 4th Floor**
**Houston, Texas 77002**
**(713) 526-1515**
**(713) 526-1798 (FAX)**

**Attorney for Appellant**
**Melissa Dromgoole**

## IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties to the trial court's judgment, and the names and addresses of all trial and appellate counsel:

Melissa Dromgoole ................................................................................Appellant

State of Texas........................................................................................ Appellee

Norman J. Silverman......................................Appellant's Retained Counsel at Trial
917 Franklin, 4th Floor                                                            and on Appeal
Houston, Texas 77002

Jay B. Cohen ...................................................Appellant's Retained Counsel at Trial
917 Franklin, 4th Floor
Houston, Texas 77002

Clint Davidson ................................................Appellant's Retained Counsel at Trial
917 Franklin, 4th Floor
Houston, Texas 77002

Kristin Assad......................................................Assistant District Attorney at Trial
1201 Franklin, Suite 600
Houston, Texas 77002

Cara Burton.........................................................Assistant District Attorney at Trial
1201 Franklin, Suite 600
Houston, Texas 77002

Carly Dessauer ................................................Assistant District Attorney on Appeal
1201 Franklin, Suite 600
Houston, Texas 77002

Alan Curry.......................................................Assistant District Attorney on Appeal
1201 Franklin, Suite 600
Houston, Texas 77002

Hon. Paula Goodheart............................................................................ Trial Judge

# CONTENTS

*Page*

Identity of Parties and Counsel ............................................................................2

Table of Contents .................................................................................................3

Index of Authorities .............................................................................................5

Statement Regarding Oral Argument ...................................................................8

Statement of the Case...........................................................................................8

Statement of Procedural History ..........................................................................8

Questions Presented for Review .........................................................................10

1. Does a police officer have a duty, when a suspect claims to be incapacitated due to an uncommon medical condition while in police custody, to further investigate the condition or to inform the blood draw nurse of the condition prior to executing a blood warrant?

2. Did the court of appeals err in formulating a per se rule, rather than using a totality of the circumstances approach, on the issue of whether a nonconsensual blood test was unreasonable due a medical condition?

3. Did the court of appeals err in refusing to consider the *Kelly* factors in examining the reliability of a HPD Crime Lab blood testing technique that violated basic industry standards?

Arguments.............................................................................................................10

Questions One and Two: Unreasonable Blood Draw ..........................................10

  A. Facts ..........................................................................................................10

B.  The Court of Appeals' Resolution ...............................................12

C.  The Court of Appeals' Inflexible Standard Places an
    Unreasonable Burden on a DWI Suspect Beyond the
    Requirements of *Johnston* and Fails to Consider the
    Totality of the Circumstances. ..................................................13

    1.  The *Johnston* standard imposes a duty on police to
        investigate whether an unfamiliar disclosed medical
        condition is relevant to blood drawing. ...........................14

    2.  The burden imposed by the court of appeals is
        unreasonable because post-arrest procedures do not
        provide a legitimate opportunity to assert a medical
        exemption...........................................................................15

    3.  Under a totality of the circumstances approach,
        Appellant met her burden. ...............................................18

Question Three:  Reliability of Blood Analysis .....................................19

A.  Facts ........................................................................................19

B.  The Court of Appeals' Analysis...............................................22

C.  The Court of Appeals' Analysis Conflicts with *Kelly.* ...........22

    1.  The court of appeals erred in refusing to consider the
        *Kelly* reliability factors. ..................................................22

    2.  The lab's error was not a single inadvertent variance
        but rather a sustained practice. ........................................23

    3.  There is no basis for judicial notice of the reliability
        of the unconventional technique.......................................24

4.    Because the court of appeals did not consider the *Kelly*
      factors, its analysis resembles the less rigorous standard
      applied to "soft" sciences....................................................................25

5.    By reducing the analysis to a mere credibility determination,
      the court of appeals failed to apply the proper burden of proof
      and burden of persuasion. ...............................................................28

Prayer ....................................................................................................................30

Certificate of Service ..........................................................................................31

Certificate of Compliance ....................................................................................31

Appendix ..............................................................................................................32

## INDEX OF AUTHORITIES

**Cases:**

*Bekendam v. State*,
      441 S.W.3d 295 (Tex. Crim. App. 2014) ........................................................24

*Blasdell v. State*,
      2015 WL 5449878 (Tex. Crim. App. Sept. 16, 2015) ......................................28

*Bumper v. North Carolina*,
      391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ......................................17

*Coble v. State*,
      330 S.W.3d 253 (Tex. Crim. App. 2010) ..................................................28, 29

*Florida v. Bostick*,
      501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ..................................15

*Florida v. Royer*,
      460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) ..................................15

*Kelly v. State*,
824 S.W.2d 568 (Tex. Crim. App. 1992) ...................................................*passim*

*Miranda v. Arizona*,
384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ...................................17

*Moore v. Ashland Chemical, Inc.*,
151 F.3d 269 (5th Cir. 1998) ..........................................................................28

*Nenno v. State*,
970 S.W.2d 549 (Tex. Crim. App. 1998) .......................................................25

*Russeau v. State*,
171 S.W.3d 871 (Tex. Crim. App. 2005) ........................................................26

*Samson v. California*,
547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) ...................................18

*Schmerber v. California*,
384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ................................12, 13

*Somers v. State*,
368 S.W.3d 528 (Tex. Crim. App. 2012) ........................................................24

*State v. Johnston*,
336 S.W.3d 649 (Tex. Crim. App. 2011) .................................................*passim*

*State v. Villarreal*,
No. PD–0306–14, -- S.W.3d --,
2014 WL 6734178 (Tex. Crim. App. Nov. 26, 2014) ................................15, 18

*United States v. Drayton,*
536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ...................................18

*Weatherred v. State*,
15 S.W.3d 540 (Tex. Crim. App. 2000) ..........................................................26

**Statutes, Rules, and Constitutional Provisions:**

TEX. PENAL CODE ANN. § 49.04(a) ...........................................................8

TEX. R. APP. P. 9.4 ...........................................................31

TEX. TRANSP. CODE ANN. § 724.012(b) ...........................................15

TEX. TRANSP. CODE ANN. § 724.013 ...............................................15

TEX. TRANSP. CODE ANN. § 724.015 ...............................................16

U.S. CONST. amend. IV ........................................................12

**To The Honorable Justices of the Court of Criminal Appeals:**

Appellant, Melissa Dromgoole, by and through the undersigned counsel, submits this petition for discretionary review.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant anticipates that oral argument would be helpful because this case presents a novel issue requiring the Court to identify relevant circumstances that may render a forced blood draw unreasonable under the Fourth Amendment due to a disclosed medical condition.

## STATEMENT OF THE CASE

Appellant was charged by information with the Class A misdemeanor offense of driving while intoxicated[1] alleged to have occurred on July 21, 2012. CR8. Appellant entered a plea of not guilty and a jury found her guilty. CR103; 118. The trial court assessed punishment at one year confinement in the county jail, probated for one year, and a $500 fine. CR53-54. Appellant filed timely written notice of appeal, and the trial court certified her right to appeal. CR127-128.

## STATEMENT OF PROCEDURAL HISTORY

On June 4, 2015, the First Court of Appeals issued a published opinion affirming Appellant's conviction and modifying the judgment. Appellant filed a

---

1 *See* TEX. PENAL CODE ANN. § 49.04(a) (Vernon 2014).

8

motion for rehearing on July 1, 2015, which was amended on July 13, 2015. On July 23, 2015, the court of appeals denied the amended motion for rehearing, vacated and withdrew its opinion of June 4, 2015, and issued a new published opinion affirming Appellant's conviction and modifying the judgment. *See Dromgoole v. State*, -- S.W.3d --, 01-13-00931-CR, 2015 WL 4497978 (Tex. App.—Houston [1st Dist.] July 23, 2015), reh'g overruled (Aug. 20, 2015).

On August 4, 2015, Appellant filed a motion for further rehearing and motion for en banc reconsideration. On August 20, 2015, these motions were denied and the court of appeals issued a corrected opinion.

This Court granted Appellant's motion to extend time for filing the petition for discretionary review until October 21, 2015.

## QUESTIONS PRESENTED FOR REVIEW

1.  Does a police officer have a duty, when a suspect claims to be incapacitated due to an uncommon medical condition while in police custody, to further investigate the condition or to inform the blood draw nurse of the condition prior to executing a blood warrant?[2]

2.  Did the court of appeals err in formulating a per se rule, rather than using a totality of the circumstances approach, on the issue of whether a nonconsensual blood test was unreasonable due a medical condition?[3]

3.  Did the court of appeals err in refusing to consider the *Kelly* factors in examining the reliability of a HPD Crime Lab blood testing technique that violated basic industry standards?[4]

## ARGUMENTS

### Questions One and Two:  Unresonable Blood Draw

Review should be granted because the court of appeals has decided an important question of state and federal law that should be settled by this Court. The court of appeals has formulated an unreasonable and inflexible standard for asserting a medical exemption to blood drawing that conflicts with *State v. Johnston*, 336 S.W.3d 649, 658-59 (Tex. Crim. App. 2011).

### A.  Facts

During the traffic stop, Appellant told the arresting officer that she had a medical condition, syncope, which she explained was fainting caused by a drop in

---

[2] 2RR41.
[3] 2RR41.
[4] 8RR15, 198.

10

blood pressure. SX4 (2:50:30-40). Officer Nunn had never heard of this condition. 5RR35; 127-138. At the police station, Appellant told several officers, including Nunn, that she could not exit the vehicle because she was having difficulty with her syncope. 2RR65; 5RR81, 164; 9RR32, 79. Appellant was able to exit the vehicle after about ten minutes. 5RR82. Nunn believed that Appellant's medical condition was just an "excuse" and that she was being "uncooperative." 2RR67, 73.

When Nunn presented the DIC-24 statutory warning form, Appellant did not consent to providing a breath or blood specimen and requested an attorney. 5RR79. Nunn obtained a warrant for a blood specimen which was executed by a nurse at the police station using the standard blood draw procedure. 5RR89, 93; SX7. The nurse testified that she was trained to use different blood drawing procedures for a patient with a history of fainting during blood draws; however, it was not her practice to inquire about an arrestee's medical history or check vital signs prior to drawing blood at the police station. 6RR16, 32-33, 41.

Appellant's physician, Dr. Varon, testified that he diagnosed Appellant's syncope in 2007 after numerous diagnostic tests. 2RR85-90. Appellant's symptoms involved episodes of pre-syncope (dizziness, weakness, and visual disturbances) and full syncope (fainting). 2RR109. Varon explained that Appellant's syncope

was caused by inadequate circulatory response to low blood pressure. 2RR142. Varon testified that Appellant had suffered episodes twice in conjunction with blood draws in his office, during one of which she blacked out completely and fell out of the chair. 2RR91. Varon testified that it was not reasonable to perform a blood draw on a person prone to syncope or low blood pressure in the standard sitting position; the patient should be lying flat. 2RR102, 116-117. Varon also testified that blood pressure should be measured in conjunction with a blood draw for a patient prone to syncope. 2RR117-118.

## B. The Court of Appeals' Resolution

Appellant claims that the blood draw was unreasonable under the Fourth Amendment because the evidence established that she had a medical condition that "could result in risk, trauma, or more than de minimus pain" if a blood draw were to be performed. *State v. Johnston*, 336 S.W.3d 649, 658-59 (Tex. Crim. App. 2011); *Schmerber v. California*, 384 U.S. 757, 771, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966). The court of appeals held that Appellant failed to meet her burden because she did not "sufficiently notif[y] the police or the person performing the blood draw of the risk posed by the blood draw." Slip op. at 13. The court held that a defendant cannot "simply state the name for an uncommon medical condition and indicate that it is associated with fainting—outside the

12

context of a blood draw and without mentioning how it might create a risk of harm in connection with a blood draw—and claim to have carried her burden." Slip op. at 19.

**C.    The Court of Appeals' Inflexible Standard Places an Unreasonable Burden on a DWI Suspect Beyond the Requirements of *Johnston* and Fails to Consider the Totality of the Circumstances.**

In *Johnston*, the Court held that failing to inquire into an individual's medical history before drawing blood does not "render blood draws per se unreasonable." *Johnston*, 336 S.W.3d at 659. The Court found that, as implied by *Schmerber*, "each suspect bears the burden of showing that a venipuncture blood draw is not a reasonable means to obtain a blood alcohol level assessment as to him or her, individually." *Id.* "A DWI suspect, naturally familiar with his or her own medical history, is in the best position to identify and disclose any peculiar medical condition that could result in risk, trauma, or more than de minimus pain if a blood draw were to be performed." *Id.* The Court held that reasonableness is presumed "in the absence of any record evidence showing that a venipuncture blood draw would not be reasonable in a particular case due to a verifiable medical condition." *Id.* Accordingly, a suspect's burden includes identifying and disclosing a medical condition, and producing record evidence showing that the disclosed condition rendered the blood draw unreasonable.

13

The Court, however, also imposed an affirmative duty on police officers to respond appropriately to a suspect's disclosures. Recognizing that a DWI arrestee's well-being and safety "are weighty concerns that should not be marginalized," the Court entrusted law enforcement officials with the duty to be "deliberate and conscientious when choosing the type of test to administer to obtain a suspect's blood alcohol level." 336 S.W.3d at 660.

1. **The *Johnston* standard imposes a duty on police to investigate whether an unfamiliar disclosed medical condition is relevant to blood drawing.**

This "deliberate and conscientious" standard contemplates that an officer who has been informed about an unfamiliar medical condition will not simply ignore this information when considering a warrant. When presented with a suspect who has identified a condition involving low blood pressure and fainting, and who claimed to be suffering from the condition while in custody, a conscientious officer should further investigate the condition before executing a blood warrant. This investigation should include, at a minimum, (1) asking the suspect whether the disclosed condition could affect the safety of a blood draw, or (2) informing the nurse or technician performing the blood draw of the disclosed medical condition.

**2.** **The burden imposed by the court of appeals is unreasonable because post-arrest procedures do not provide a legitimate opportunity to assert a medical exemption.**

While officers routinely ask about medical conditions in conjunction with sobriety testing, there are no procedures in place for ascertaining whether a DWI arrestee has a medical condition relevant to blood drawing. Nevertheless, the court of appeals faulted Appellant for having disclosed her condition "outside the context of a blood draw." A DWI arrestee cannot fairly be tasked with volunteering this information in the context of a consent request or in the face of a warrant, as the court of appeals would require.

It is legally incompatible with a consent request to require a suspect to explain a refusal. Under Texas law, an individual who is arrested for an "ordinary" DWI "has an absolute right to refuse to provide a specimen." TEX. TRANSP. CODE ANN. §§ 724.012(b), 724.013; *State v. Villarreal*, No. PD–0306–14, -- S.W.3d --, 2014 WL 6734178, at *7 (Tex. Crim. App. Nov. 26, 2014). Likewise, under the Fourth Amendment, an officer does not need a reason to request consent, and a citizen is free to decline, without presenting any reason. *Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229 (1983). It is inconsistent with these rights to require a suspect to justify her refusal; to do so would effectively

15

render the right to refuse conditional.

Moreover, the consent request procedure used in Texas does not present a logical opportunity to assert a medical exemption. When an officer requests a breath or blood specimen, a suspect is confronted with a legal form detailing numerous statutory consequences of refusing to consent. *See* TEX. TRANSP. CODE ANN. § 724.015 (West Supp. 2014). Nowhere in the form is there any indication that a suspect must inform the police of any medical conditions relevant to blood drawing. The written warnings inform the suspect of the right to a hearing on a license suspension, but do not inform the suspect about the right to a medical exemption. The form permits a suspect to indicate only whether she refuses consent, but not her reasons for doing so.[5] Nothing in the form or the procedure would indicate that it is incumbent on the suspect to volunteer information justifying the consent refusal, or that the police would be receptive to a suspect's explanations. In fact, Officer Nunn admitted that he routinely disregards reported medical conditions as mere "excuses" and maintained that Appellant was being uncooperative. 2RR28, 67, 73-77.

The only other opportunity to assert a medical exemption is when the suspect is presented with a warrant—a court order requiring her to submit to a

---

[5] *See* SX6 (DPS DIC-24 Statutory Warning Form).

blood draw. But the subject of a validly issued search warrant has no right to resist the search. *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search."). Police armed with a warrant are even permitted to use force to "restrain an uncooperative DWI suspect in order to obtain a blood sample." *Johnston* at 663. If a suspect presented with a warrant has no right to object to its execution, it cannot be the case that a suspect must do so in order to assert a constitutional right.

Moreover, a DWI arrestee may be too incapacitated, either from intoxication or from a medical condition, to effectively explain the nature of the risk. An arrestee in a vulnerable state is even less likely to raise an objection in the face of a warrant. The Supreme Court has observed that, with respect to the right to counsel, "[w]e cannot penalize a defendant who, not understanding his constitutional rights, does not make the formal request and by such failure demonstrates his helplessness." *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S. Ct. 1602, 1626, 16 L. Ed. 2d 694 (1966). This reasoning is all the more compelling in the context of an impaired or ill suspect faced with a court order requiring her submission.

**3.** **Under a totality of the circumstances approach, Appellant met her burden.**

When resolving questions of Fourth Amendment reasonableness, a court examines the totality of the circumstances to determine whether a particular search is reasonable. *Villarreal* at *8; *Samson v. California*, 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). Accordingly, per se rules are generally "inappropriate the Fourth Amendment context." *Id.*; quoting *United States v. Drayton,* 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002).

The court of appeals' inflexible test amounts to a per se rule, rather than a case-by-case assessment of the circumstances. This per se rule fails to take into account that the content of suspect's disclosure, in conjunction with surrounding circumstances, can put an officer on notice of a potential risk sufficient to render a blood test unreasonable, even if the suspect does not explain the specific nature of the risk.

In this case, Appellant told Officer Nunn that her condition was related to low blood pressure and fainting, and that it rendered her temporarily unable to stand while in police custody. Any reasonable person would further investigate the nature of the medical condition, or notify the blood drawing technician, before subjecting the arrestee to a nonconsensual blood draw. Nunn's failure to do so in these circumstances rendered the blood draw unreasonable. The Court should grant

review to clarify a suspect's burden for asserting a medical exemption to a blood draw.

## Question Three: Reliability of Blood Analysis

Review is warranted because court of appeals failed to apply the correct burden of proof, burden of persuasion, and applicable analysis required by *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

**A. Facts**

When the HPD Crime Lab analyzed Appellant's blood specimen, it violated basic industry standards by failing to conduct the test in accordance with a validated method.

The State's experts testified that the internal operating standards of the lab and the standards of its accrediting agency require all case work to be conducted in accordance with the validated method established for an instrument. 6RR129; 7RR13-14, 19-20, 24; 61; 92; 134; 155; 188; 191-92; 196-97; 8RR159.

A validation study was conducted several months prior to the analysis of Appellant's specimen. 7RR14. The validation study was required after the lab replaced important parts of the headspace chromatograph. 7RR108-109, 140; 8RR159-160. The purpose of a validation study is to demonstrate that an instrument will produce reliable results at specific parameters (settings). 7RR172-

19

73. The State's experts testified that parameters may be adjusted during the development of the method but should remain fixed for the duration of the validation study. 6RR148-149; 8RR172-173.

HPD Criminalist L. Mayor conducted the validation study and the analysis of Appellant's specimen. The validation report stated that the study was conducted with the vial oven set at 70 degrees Celsius. DX20; DX21. But the supporting documentation showed that all of the fundamental components of the study were conducted with the vial oven set at 60 degrees. 6RR131; 7RR26-37, 57-59; DX20. This parameter was changed to 70 degrees on the fourth and final day of the study, where it remained for subsequent forensic casework, including the analysis of Appellant's specimen. DX20; DX21; 6RR131; 7RR26-37, 58. The only portion of the study conducted at the 70-degree setting was an optional criterion that was not duplicative of the fundamental components. 7RR58, 115-116.

Mayor and her supervisor, W. Arnold, opined that Appellant's test results were reliable despite the deviation for two reasons, neither of which satisfactorily addressed the issue. First, they testified that a temperature change should not impact the test results because the instrument measures the ratio between a known standard (n-Propanol) added to each sample and the unknown ethanol content of the sample. Because, theoretically, an increase in temperature would

proportionately increase the instrument's response to both, the ratio should not be affected. 7RR59-60; 68-69; 74. This explanation, however, is dependent on a properly functioning machine, because the scientific principle ("Henry's Law") upon which it is based requires a constant pressure and temperature. 7RR35; 118. Without proper validation, there can be no assumption that the machine maintains these conditions at the designated parameters.

Second, the State's experts testified that the lab routinely tests controls (substances with known concentrations) in conjunction with forensic samples to check the instrument's accuracy. 7RR96; 8RR150. But the State's experts admitted that the use of controls is not a substitute for proper validation, which is a regimented procedure that involves more than simply running controls.[6] 7RR62; 156; 189; 191; 201-02.

As explained by Appellant's expert, A. Culbertson, the use of controls is no substitute for a method validation because validation is a condition precedent to expressing results: "you have to have a validated method before you can even speak to the results of a control or a sample." 7RR156, 168. Culbertson testified that the method used to analyze Appellant's sample was not validated; therefore, the results were not scientifically valid or reliable. 7RR166.

---

6 See 7RR26-29 for a description of the validation study procedure.

**B. The Court of Appeals' Analysis**

Appellant claims that the State failed to establish clear and convincing evidence that the blood test was reliable, in light of the *Kelly* analysis, because the lab's technique was not shown to be accepted as valid by the scientific community and was not supported by any literature or other independent, objective source material.

The court of appeals refused to apply the multi-factor *Kelly* analysis. Slip op. at 30-32. Instead, it characterized the issue as a credibility determination, requiring deferential review, and held that the trial court was within its discretion in resolving the issue in favor of the State. Slip op. at 38-39.

**C. The Court of Appeals' Analysis Conflicts with *Kelly*.**

    **1. The court of appeals erred in refusing to consider the *Kelly* reliability factors.**

In *Kelly*, the Court set forth three criteria that scientific evidence must satisfy: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Id.* at 573. The Court identified seven non-exclusive factors for consideration in the reliability determination: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the

qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Id.*

The court of appeals held that the *Kelly* factors were inapplicable because it found that Appellant's complaint did not involve a challenge to the validity of the technique, but only a challenge to the improper application of the technique. The court characterized the lab's practice as a mere "inadvertent variance" rather than a new technique subject to the *Kelly* multi-factor analysis. Slip op. at 31-32.

2. **The lab's error was not a single inadvertent variance but rather a sustained practice.**

The court of appeals' analysis is erroneous because the challenged practice went beyond a mere inadvertent variance. To the extent that inadvertence is relevant to the applicable analysis, the lab employees denied that the temperature change was unintentional and defended the practice as proper. Mayor testified that she "must have had permission" to change the temperature setting (7RR53), while her supervisor, Arnold, testified that Mayor acted properly within her discretion in changing the parameter without supervisor clearance (8RR145-149).

Moreover, the variance did not merely involve a single test. The lab failed to conduct a full validation study after replacing components on the machine, which calls into question all subsequent forensic testing done on the machine pursuant to the incomplete validation. This is a significant omission that bears directly on the validity of the technique itself, not just whether the technique was properly applied on a single occasion.

### 3. There is no basis for judicial notice of the reliability of the unconventional technique.

This Court has held that in some cases the first two prongs of the *Kelly* test—the validity of the underlying scientific theory and the validity of the technique applying that theory—can be determined through judicial notice, thereby relieving the proponent of the burden of producing evidence on that question. *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012). But the Court cautioned that some court must have actually examined and assessed the reliability of the particular theory or technique "before other courts may ride along behind it." *Id*.

While the Court has recognized that gas chromatography is accepted as reliable, this reliability is, of course, contingent on the use of "a validated and calibrated instrument." *Bekendam v. State*, 441 S.W.3d 295, 304 (Tex. Crim. App. 2014). No court has actually examined the reliability of the practice challenged

24

here. There is no basis for taking judicial notice of the reliability of a technique that dispenses with the industry-standard validation requirement.

By failing to complete a proper validation study with fixed parameters, and by conducting forensic analysis with the machine set at unvalidated parameters, the lab implemented a technique that deviated from industry standards. Additionally, by relying solely on the use of controls to demonstrate the machine's reliability, in lieu of a proper and full validation study, the lab implemented a new technique that has not been shown to be generally recognized as reliable. Regardless of whether the lab's technique was intentional or merely the result of sloppy work, it constitutes a significant departure from standard procedures, and thus should be subjected to a meaningful reliability review pursuant to the *Kelly* factors.

4. **Because the court of appeals did not consider the *Kelly* factors, its analysis resembles the less rigorous standard applied to "soft" sciences.**

This Court has recognized that  when addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method, *Kelly*'s requirement of reliability applies but with less rigor than to the hard sciences. *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), overruled on other grounds by *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). When "soft" sciences are at

issue, the trial court should inquire: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies on or utilizes the principles involved in the field. *Russeau v. State*, 171 S.W.3d 871, 883 (Tex. Crim. App. 2005).

Forensic chemistry is a hard science, so the rigorous *Kelly* analysis is required. *Weatherred v. State*, 15 S.W.3d 540, 542 n. 5 (Tex. Crim. App. 2000) ("hard sciences" include mathematics, physical science, earth science, and life science).

Instead of examining the *Kelly* factors, the court of appeals examined only whether the State's experts utilized principles involved in the field. The court's analysis focused on a scientific principle known as Henry's Law, as described by the State's experts. The opinion explains that, according to Henry's Law, in a closed environment (such as a sealed vial) with a constant temperature, the volume of volatile compounds (such as alcohol and n-Propanol) in a liquid will be proportional to the concentration of those compounds released into the headspace above the liquid. Accordingly, the ratio of alcohol to n-Propanol should not be affected by a temperature increase. Because the test results are derived from the ratio, a temperature change should have no effect on the results. Slip Op. at 35-37.

This focus on Henry's Law, however, is a red herring. The testimony of the State's experts regarding Henry's Law explained only that, theoretically, an increase in temperature would not affect the test results. But this testimony did not address the real issue of whether the change in the instrument's settings affected its functioning—for example, its ability to maintain a constant temperature. In a perfect world in which all machines always functioned perfectly, Henry's Law would play out predictably, obviating the need for validation studies. But because performance varies from one instrument to another, a validation study is required to demonstrate that a machine performs reliably at defined parameters, including the vial oven temperature. Tellingly, Arnold was able to testify only that, with a 10-degree temperature change, he "wouldn't expect there to be any impact on the analytical results." 8RR147. He could not assure, without speculating, that the deviation had no unexpected consequences on the machine's functioning.

Accordingly, the court of appeals erred in finding that the State met its burden by virtue of Arnold's explication of a tangentially related scientific principle. Instead, the court of appeals should have examined whether the State produced evidence that the lab's practice of deviating from validated parameters is accepted as valid by the relevant scientific community, is supported by literature, has a known error rate, and has been evaluated by other experts. *Kelly* at 573. This

analysis especially critical here because the State's experts failed to identify any literature or other objective, independent source material supporting the challenged practices, but offered only their mere assurances or bare opinions. *Coble v. State*, 330 S.W.3d 253, 277-79 & n.69 (Tex. Crim. App. 2010) (an expert's "assurances that he has utilized generally accepted scientific methodology" are insufficient unless supported by "some objective, independent validation of the expert's methodology"), quoting *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir.1998).

**5.    By reducing the analysis to a mere credibility determination, the court of appeals failed to apply the proper burden of proof and burden of persuasion.**

It is well-established that the proponent of expert scientific testimony must prove by clear and convincing evidence that the proffered testimony is reliable. *Blasdell v. State*, 2015 WL 5449878, at \*2 (Tex. Crim. App. Sept. 16, 2015); *Kelly* at 572.

The court of appeals mischaracterized the issue as "a resolution of conflicting evidence between experts," thus requiring the court to defer to the trial court's credibility determinations. Slip op. at 39. This analysis disregards the required burden of proof and burden of persuasion.

Even assuming that the Arnold's testimony about Henry's Law was entirely

credible and true, and even if Appellant had not offered her own expert testimony, the State failed to establish by clear and convincing evidence that the lab's unconventional technique was reliable. The State's experts provided no evidence that the lab's practice of deviating from validated parameters was accepted by the relevant scientific community, was supported by any literature, or had been evaluated by other experts. Nor did the State's experts provide anything but mere assurances and bare opinions supporting the lab's reliance on the use of controls, in lieu of proper validation, to demonstrate a machine's accuracy.

The court of appeals held that the evidence was properly admitted because the defense expert did not "disprove[] as a matter of law" Arnold's testimony about Henry's Law. Slip Op. at 36. This burden shifting is irreconcilable with the standard announced in *Kelly.* Because the State failed to produce any evidence, beyond the experts' mere assurances, that their unconventional technique was accepted by the scientific community as reliable, the court of appeals erred in requiring Appellant to disprove the State's evidence "as a matter of law."

## Conclusion

While the admission of expert testimony is reviewed on appeal for an abuse of discretion, appellate review must ensure that the trial judge acts "as a true 'gatekeeper.'" *Coble* at 272. Accordingly, reviewing courts must examine whether

29

the basis of an expert's testimony is grounded in the "accepted methods and procedures of science" and supported by "appropriate validation." *Id.* The court of appeals' abbreviated analysis dispensed with the rigorous inquiry appropriate for hard sciences, and thus failed to ensure that the trial court acted as a true gatekeeper.

## PRAYER

Appellant prays that this Court grant discretionary review, reverse Appellant's conviction, and remand the case for a new trial.

Respectfully submitted,

/s/ *Norman J. Silverman*
NORMAN J. SILVERMAN
T.B.C. No. 00792207
917 Franklin, 4th Floor
Houston, Texas 77002
(713) 526-1515
(713) 526-1798 (FAX)

Attorney for Appellant
Melissa Dromgoole

## CERTIFICATE OF SERVICE

This document has been served on the following parties electronically through the electronic filing manager on October 19, 2015.

Carly Dessauer
Harris County District Attorney's Office
dessauer_carly@dao.hctx.net

Alan Curry
Harris County District Attorney's Office
curry_alan@dao.hctx.net

Office of the State Prosecuting Attorney
information@spa.texas.gov

/s/ Norman J. Silverman

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that the relevant sections of this computer-generated document have **4,404** words, based on the word count function of the word processing program used to create the document. TEX. R. APP. P. 9.4 (i).

/s/ Norman J. Silverman

## **APPENDIX**

Opinion of the First Court of Appeals
*Dromgoole v. State*, -- S.W.3d --, 01-13-00931-CR, 2015 WL 4497978 (Tex. App.—Houston [1st Dist.] July 23, 2015), reh'g overruled (Aug. 20, 2015)



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-13-00931-CR**

_____

**MELISSA DROMGOOLE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from County Criminal Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1840727**

---

**OPINION ON REHEARING**

Appellant, Melissa Dromgoole, was charged by information with driving while intoxicated.[1]  Appellant pleaded not guilty.  The jury found her guilty. The trial court found an enhancement paragraph to be true and assessed punishment at

---

[1]     *See* TEX. PENAL CODE ANN. § 49.04(a) (Vernon 2014).

one year's confinement—probated for one year—and a fine of $500. In four issues on appeal, Appellant argues the trial court abused its discretion by (1) denying her motion to suppress and (2) admitting the blood-test evidence over her challenge to the reliability of the evidence.

On June 4, 2015, we issued our original opinion in this case. Dromgoole filed an amended motion for rehearing. We deny the amended motion for rehearing, withdraw our prior opinion and judgment, and issue this opinion and a new judgment in their place. Our disposition remains the same.

We modify the judgment and affirm as modified.

## Background

Officer D. Nunn, an officer with the Houston Police Department, had pulled someone over some time after 2:00 A.M. on July 21, 2012. After he was done with that person, he walked back to his car. On his way back, Appellant drove past him and nearly hit him. Officer Nunn got in his patrol car and pursued Appellant. During the pursuit, he saw Appellant drive through two red lights. After Appellant pulled over, Officer Nunn approached her car. Appellant had glassy eyes and slurred speech and smelled moderately of alcohol. Appellant acknowledged that she had consumed two alcoholic drinks in the evening.

Officer Nunn decided to perform a field sobriety test on Appellant. Before conducting the test, he asked Appellant if she had any medical conditions.

2

Appellant responded that she had syncope, which she described as low blood pressure. Specifically, she explained that, with syncope, her "blood pressure drops and then [she] faints."

As part of the field sobriety test, Officer Nunn performed three specific tests: a horizontal-gaze-nystagmus test, a one-leg-stand test, and a walk-and-turn test. Appellant exhibited indications of intoxication on each test. Officer Nunn arrested Appellant and drove her to the police station.

At the police station, Appellant said she could not get out of the car because she was having difficulty with her syncope. In a later affidavit, Appellant asserted that, when she was in the police car, her condition worsened "and I was unable to get out of the police car for about ten minutes. At the jail, I again told the officer of my condition." Officer Nunn testified that, when they arrived at the police station, Appellant said she could not get out because of her low blood pressure. Ten minutes later, she was able to get out of the car.

Once inside the police station, Appellant was placed in a holding cell with other people. While there, Appellant got into a fist fight with another woman in the cell. Officer Nunn broke up the fight. At the end of the fight, Appellant did not exhibit any dizziness or lightheadedness.

At some point, Officer Nunn decided to obtain a blood draw from Appellant. Appellant refused to submit to a blood draw. As a result, Officer Nunn sought and

3

obtained a search warrant for a blood draw on Appellant. The video of the blood draw shows that Officer Nunn led Appellant into the room. Appellant sat in an inclined chair. Officer Nunn explained to Appellant that he had obtained a warrant for the withdrawal of a sample of her blood. Appellant presented her arm to the nurse, who then drew Appellant's blood.

L. Mayor, a criminalist at the Houston Police Department Crime Laboratory, performed the analysis on Appellant's blood. The report from the test indicated that appellant's blood contained a concentration of alcohol of 0.17 grams of alcohol per 100 milliliters of blood.

Before trial, Appellant filed a motion to suppress the blood test results, arguing, among other things, that the blood draw was a violation of her rights under the Fourth Amendment of the United States Constitution against unreasonable searches and seizures. Specifically, Appellant argued that the affidavit in support of the warrant failed to identify that she had syncope; that the effects of pre-syncope could account for why she failed the field sobriety test; and that her medical condition of syncope rendered the blood draw unreasonable as it applied to her.

At the hearing on the motion to suppress, Appellant presented her physician, Dr. J. Varon. Dr. Varon testified that he diagnosed Appellant with syncope about five years before the trial. Syncope is the condition of being subject to fainting

spells.  A person who has syncope will also have pre-syncope, or symptoms that can signal the possible onset of fainting.  The pre-syncope symptoms can vary widely among people, but can include dizziness, weakness in the legs, chest pains, or a sense of "pulling of the blood."  Contrary to Appellant's description of syncope to Officer Nunn, Dr. Varon testified that Appellant does not, in fact, have low blood pressure.  Her blood pressure is normal, and her syncope does not affect her blood pressure.

Dr. Varon also testified that, after viewing the video of Appellant's field sobriety test, it was possible that Appellant was experiencing pre-syncope during the field sobriety test.  He asserted that, as a result, it was possible that her troubles with the three field sobriety tests were influenced by the pre-syncope.  For the walk-and-turn test, Dr. Varon testified it was "more likely than not" that Appellant's troubles with the test were "related to a pre-syncope equilibration." For the other two, he only testified it was possible that the difficulties were related to pre-syncope.

Finally, Dr. Varon testified that syncope could create some risk with a blood draw.  While he acknowledged that he had performed numerous blood draws on Appellant, he testified that Appellant had complete syncope (that is, she fainted) during one blood draw.  During a second blood draw, Appellant had a "pre-syncopal episode," meaning that she complained of "feeling fainty" and turned

white. During this second incident, Dr. Varon resolved this by having Appellant lie down. Dr. Varon testified that it is not reasonable to perform a blood draw from a person with syncope without having the person lie down.

The trial court denied the motion to suppress.

At trial, the State called Mayor to discuss the results of the test on Appellant's blood. After a question about whether the machine that tested Appellant's blood was working properly on the day of the test, Appellant raised another objection to the admissibility of the blood test. During the hearing on this objection, Appellant argued that the blood draw technique was not properly applied because the machine that performed the blood test had not been properly validated. Based on documents produced at the time of the validation test, Appellant argued that, during three of the four days of the validation test, the machine's vial oven had been set at 60 degrees Celsius when it was intended to be set at 70 degrees Celsius.

The State presented the testimony of Mayor and W. Arnold, a police administrator for the Houston Police Department Crime Laboratory, at the hearing on the second motion to suppress. Both Mayor and Arnold testified that the discrepancy in the oven temperature did not affect the ultimate validation of the machine. Arnold explained that the test results are not obtained from a measurement of only the alcohol released by the heating, but instead from a

determination of the ratio between measurements of the alcohol and a control compound added to the sample. Because the change in temperature would have resulted in a proportional change to both chemicals being released by the heating, the measurements remained accurate, and, accordingly, the validation test was reliable.

Additionally, both Mayor and Arnold testified that samples with known concentrations of alcohol were tested every time a suspect's blood was tested. Any deficiencies in the machine's ability to accurately measure the concentration of alcohol in Appellant's blood would have been detected in measuring the known quantity samples.

Appellant subpoenaed Irma Rios, the lab director for the Houston Police Department, to testify. Like Mayor and Arnold, Rios testified that the difference in temperature would not affect the reliability of the validation test. She testified that the known concentration samples would have detected any problems with the measurement of the machine.

Appellant also presented her own expert witness, A. Culbertson. Culbertson had many years of experience with performing blood tests and consulting on reviewing blood test results. She testified that, in order for a machine to produce reliable results, it must be validated first. She asserted that the measurement of controls (known concentration samples) during regular testing could not establish

that the machine had been properly validated "[b]ecause you have to have a valid method before you can even speak to the results of a control or a sample."

The trial court denied Appellant's second motion to suppress. At the time of the ruling, the court expressly found that Mayor and Arnold were credible and that the blood test results were reliable.

## Reasonable Search and Seizure

In her first two issues, Appellant argues the trial court abused its discretion by denying her motion to suppress the blood-draw evidence because Appellant's medical condition was omitted from the affidavit in support of the warrant for the blood draw and the blood draw was unreasonable based on Appellant's medical condition.

### A. Standard of Review

Where, as here, a trial judge does not make explicit findings of fact, we review the evidence at a motion to suppress hearing in the light most favorable to the trial court's ruling. *Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000). We afford almost total deference to a trial court's determination of questions of fact and its rulings on mixed questions of law and fact when the resolution of those questions depends on an evaluation of credibility and demeanor. *State v. Johnston*, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011). For mixed questions of law and fact that do not depend on an evaluation of credibility

8

and demeanor and for pure questions of law, we review the trial court's rulings de novo. *Id.*

At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We will defer to the trial court's fact findings and not disturb the findings on appeal unless the finding is not supported by the record. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

## B. Applicable Law & Burden of Proof

At a hearing on a motion to suppress based on a violation of the defendant's Fourth Amendment rights, the court presumes that police conduct was proper. *Delafuente v. State*, 414 S.W.3d 173, 176 (Tex. Crim. App. 2013). The defendant bears the burden, then, of rebutting the presumption of proper police conduct. *Id.* The defendant can meet this burden, thus shifting the burden to the State, by showing the search was conducted without a warrant. *Id.* Here, however, all parties agreed that Appellant's blood was drawn after the police had obtained a warrant. Accordingly, the parties recognize that Appellant bore the burden of proof of rebutting the presumption of proper police conduct at the motion to

9

suppress. *See id.* Nevertheless, the parties do not entirely agree on what Appellant had to prove in order to meet her burden of rebutting proper police conduct.

In her motion to suppress, Appellant argued that the blood draw violated her rights against unreasonable search and seizure under the Fourth Amendment of the United States Constitution and, accordingly, should be suppressed. "*Schmerber v. California* is the landmark case addressing the constitutionality of compulsory blood draws conducted for law-enforcement purposes under the Fourth Amendment." *Johnston*, 336 S.W.3d at 657 (citing *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826 (1966)). *Schmerber* identifies a two-part analysis for determining the legality of a blood draw: "(1) 'whether the police were justified in requiring [the defendant] to submit to a blood test; and, (2) 'whether the means and procedures employed in taking [the defendant's] blood respected the relevant Fourth Amendment standards of reasonableness.'" *Id.* at 658 (quoting *Schmerber*, 384 U.S. at 768, 86 S. Ct. at 1834). The Court of Criminal Appeals has recognized that "means and procedures" under the second element contains two separate inquiries: (1) whether the test chosen (the means) was reasonable and (2) whether the test was performed in a reasonable manner (the procedures). *Id.*

These are the primary, disjunctive elements for a defendant to challenge the reasonableness of a blood draw under the Fourth Amendment. *See id.* For a defendant challenging the means or procedures of the blood test on the basis that

the blood draw created an unreasonable medical risk due to a medical condition of the defendant, additional elements must also be proved.

"Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. . . . [F]or most people the procedure involves virtually no risk, trauma, or pain." *Schmerber*, 384 U.S. at 771, 86 S. Ct. at 1836. Accordingly, venipuncture blood-draws to test for intoxication are presumptively reasonable under the Fourth Amendment for the general population. *See id.*; *Johnston*, 336 S.W.3d at 659. To defeat this presumption, the defendant must show that she is "one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing." *Schmerber*, 384 U.S. at 771, 86 S. Ct. at 1836. Appellant claims to fall within the concern-for-health exception.[2]

Before requiring a defendant to submit to a blood draw, a police officer does not have a duty to inquire into the defendant's medical history. *Johnston*, 336 S.W.3d at 659. Rather, the suspect, naturally familiar with his or her own medical history, is in the best position to identify and disclose any particular medical

---

[2] To the degree Appellant believes she also falls in the "fear" exception, her degree of fear and the relevance of the fear have not been developed in this record or in her legal arguments at trial and on appeal. *See* TEX. R. APP. P. 33.1(a) (requiring complaint to be made to trial court before being raised on appeal), 38.1(i) (requiring briefs to contain concise arguments for contentions made); *see also State v. Krause*, 484 N.W.2d 347, 350 (Wis. Ct. App. 1992) (holding statements by defendant that he "didn't believe in needles" and "d[id]n't want AIDS" were insufficient to establish fear exception).

condition that could result in risk, trauma or more than de minimus pain if a blood draw were to be performed. *Id.* at 660. From this we can conclude that the defendant bears the burden to establish that she notified the officer or the person performing the blood draw that her relevant medical history would render a blood draw unreasonably medically risky. *See id.* Appellant argues that she should not have a burden to inform the police officer or person performing the blood draw about how the blood draw could impact her due to a medical condition. Instead, she argues, she should be able to present this fact for the first time at the motion to suppress to defeat the presumption of a reasonable blood draw. We must reject this argument.

The United States Supreme Court has held that the relevant inquiry into the reasonableness of a search and seizure depend on the facts known to the officer at the moment of the search and seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 1880 (1968).[3] Specifically, it held the relevant question is "would the facts *available to the officer* at the moment of the seizure or the search 'warrant a man

---

[3]  *Terry* concerned a warrantless search. *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968). Nevertheless, the court held that, "the notions which underlie both the warrant procedure and the requirement of probable cause remain fully relevant in this context." *Id.* Additionally, we see no justification for restricting the relevant facts to what the officer knew at the time of the search for warrantless search cases but expanding the relevant facts for cases where the officer obtained a warrant before the search. The law is meant to incentivize police officers to obtain a warrant before performing searches and seizures. *See United States v. Leon*, 468 U.S. 897, 914, 104 S. Ct. 3405, 3416 (1984) (recognizing preference for courts to adopt rules incentivizing obtaining warrants before search and seizure).

12

of reasonable caution in the belief' that the action taken was appropriate?" *Id.* (emphasis added). Because the relevant inquiry is what information was available to the officer at the time of the seizure, a defendant cannot seek suppression of evidence based on facts that are disclosed for the first time in a motion to suppress hearing. *See id.*

The defendant also has a burden at the hearing on the motion to suppress to show "that a venipuncture blood draw [was] not a reasonable means to obtain a blood alcohol level assessment as to him or her, individually." *Johnston*, 336 S.W.3d at 660. Stated differently, a defendant who disclosed to the officer that she has a medical condition creating an unreasonable medical risk for a blood draw must establish at the motion to suppress hearing that she does, in fact, suffer from that medical condition and that the medical condition does, in fact, create an unreasonable medical risk for a blood draw. *See id.*

Accordingly, based on *Schmerber* and *Johnston*, a defendant seeking to suppress a blood draw as an unreasonable search and seizure must prove (1) the police were not justified in requiring the defendant to submit to a blood test, (2) drawing the defendant's blood was an unreasonable method to determine intoxication, or (3) the procedure for the blood draw was unreasonable. *See Schmerber*, 384 U.S. at 768, 86 S. Ct. at 1834; *Johnston*, 336 S.W.3d at 658. *Johnston* further establishes that, if the defendant is seeking to prove the second or

13

third elements by proving the existence of a medical condition, the defendant must additionally prove (1) the defendant had a medical condition (2) that created an unreasonable risk of medical harm for a blood test and (3) that the defendant sufficiently notified the police or the person performing the blood draw of the risk posed by the blood draw. *See Johnston*, 336 S.W.3d at 659–60.

Appellant challenges all three primary elements in her first two issues in her brief. Because we find it dispositive, we address the requirement that Appellant notify the police or the person drawing her blood that the blood draw posed an unreasonable medical risk.

## C.   Justification to Conduct Seizure

*Schmerber* involved a warrantless blood draw. 384 U.S. at 768, 86 S. Ct. at 1834. Typically, the existence of a valid warrant will establish the justification to conduct the seizure. *Adkins v. State*, 418 S.W.3d 856, 860 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Here, however, Appellant has attacked the validity of the warrant in her second issue. Appellant presents two grounds for why the warrant is invalid: (1) the affidavit in support of the warrant failed to identify that she had syncope and (2) the effects of pre-syncope could account for why she failed the field sobriety test.

If there is an affirmative misrepresentation in a probable cause affidavit in support of a search warrant and if the misrepresentation is material and necessary

14

to establishing probable cause, the warrant is invalid under the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 2676 (1978); *Blake v. State*, 125 S.W.3d 717, 723–24 (Tex. App.—Houston [1st Dist.] 2003, no pet.). This ruling has been extended to material omissions. *Blake*, 125 S.W.3d at 724. At a *Franks* hearing, the defendant bears the burden by a preponderance of the evidence to establish that a false statement was made—or a true statement was omitted—intentionally, knowingly, or with reckless disregard for the truth. *See Franks*, 438 U.S. at 155–56, 98 S. Ct. at 2676. If the defendant carries that burden, the false statement is removed from the affidavit, or the true statement is added, and the court must determine whether probable cause for the warrant still exists. *See id.* at 156, 98 S. Ct. at 2676. If it does not, the warrant must be voided and the fruits of the search must be suppressed. *Id.*

Appellant's first ground for why the warrant is invalid is that the affidavit in support of the warrant failed to identify that she had syncope. Appellant argues that, if it had known that she suffered from syncope and knew the implications of performing a blood draw on someone with syncope, the magistrate "could have ascertained that a blood draw presented an unreasonable risk of trauma or more than de minimus pain." This argument is redundant to our analysis of the other *Schmerber* elements, however. Under *Schmerber* we must review whether the method for or the performance of a blood draw was unreasonable. *See Schmerber*,

15

384 U.S. at 768, 86 S. Ct. at 1834; *Johnston*, 336 S.W.3d at 658. If we determine that the blood draw method or procedure was unreasonable, then we must suppress the evidence obtained regardless of whether a magistrate judge would have denied the motion for the same reason.[4] *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005) (prohibiting evidence obtained in violation of United States Constitution from being admitted at trial).

Appellant's second ground for why the warrant is invalid is that the effects of pre-syncope could account for why she failed the field sobriety test. As part of his field sobriety test, Officer Nunn conducted a horizontal-gaze-nystagmus test, a one-leg-stand test, and a walk-and-turn test. Appellant exhibited indications of intoxication on each test.

In his testimony at the hearing on the motion to suppress, Dr. Varon claimed that it was possible that Appellant was experiencing pre-syncope during the field sobriety test and that, as a result, it was possible that her troubles with the three field sobriety tests were influenced by the pre-syncope. For the walk-and-turn test, Dr. Varon testified it was "more likely than not" that Appellant's troubles with the test were "related to a pre-syncope equilibration." For the other two, he only testified it was possible that the difficulties were related to pre-syncope.

---

[4]    As a result, we do not need to determine whether the reasonableness of the method or performance of the search is even a matter to be considered by the magistrate.

16

Even assuming Officer Nunn excluded Appellant's diagnosis of syncope from his probable cause affidavit intentionally, knowingly, or with reckless disregard for the truth, we cannot conclude that inclusion of Appellant's diagnosis of syncope in the affidavit would have defeated a determination of probable cause for the warrant. Probable cause to support a warrant is reviewed under a totality-of-the-circumstances analysis. *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012). "Probable cause exists when, under the totality of the circumstances, there is a 'fair probability' that contraband or evidence of a crime will be found at the specified location." *Id.* Under this analysis, we are not concerned with whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to the overall circumstances. *Angulo v. State*, 727 S.W.2d 276, 279 (Tex. Crim. App. 1987) (citing *Illinois v. Gates*, 462 U.S. 213, 243 n.13, 103 S. Ct. 2317, 2335 n.13 (1983)). Even seemingly innocent behavior can establish probable cause in light of the suspicious circumstances under which the behavior occurred. *Id.* at 279–80.

Here, the record establishes that Appellant had been drinking that night, nearly hit Officer Nunn while driving, drove through two stop lights, smelled of alcohol, had slurred speech, and failed all three of the field sobriety tests conducted on her that night. The fact that there *might* be an innocent explanation for failing the field sobriety test does not disprove probable cause. Under the totality of the

17

circumstances, Appellant's failure of the field sobriety test was consistent with the other facts to create a "fair probability" that blood tests would establish Appellant was legally intoxicated. *See id.*

We overrule Appellant's second issue.

## D. Notice of Unreasonable Medical Risk

In her first issue, Appellant argues that the blood draw constituted an unreasonable seizure due to her medical condition of syncope. In her affidavit presented at the motion to suppress, Appellant claimed, "I told everyone else involved in taking my blood that I did not want to undergo a blood test because blood tests have caused me to black out in the past." The trial court could have disregarded that assertion, however, and we must show almost total deference to the trial court's determination of historical facts. *See Ross*, 32 S.W.3d at 855 (holding trial court "may believe or disbelieve all or any part of witness's testimony"); *Johnston*, 336 S.W.3d at 657 (holding appellate courts afford almost total deference to trial court's determination of historical fact and mixed questions of law and fact when resolution depends on evaluation of credibility and demeanor).

The video of the field sobriety test shows Officer Nunn asking Appellant if she has any medical conditions. Appellant responded that she has syncope,

describing it as low blood pressure. She explained that, with syncope, her "blood pressure drops and then [she] faints."

Contrary to Appellant's statement to Officer Nunn, Dr. Vargas testified that Appellant does not, in fact, have low blood pressure. Her blood pressure is normal, and her syncope does not affect her blood pressure. Even assuming Officer Nunn was under a duty to report all health problems that had been conveyed to him to the person drawing Appellant's blood, a warning of low blood pressure would not have conveyed appropriate information to prevent an unreasonable blood draw.

We are left with, then, Appellant's statement to Officer Nunn, in the context of a field sobriety test, that she had syncope and that this condition has some relationship to fainting. Appellant argues that this was enough to satisfy her burden to alert the officer of any potential complications that could arise from a blood draw. We cannot agree.

A blood draw is presumptively reasonable unless a defendant establishes she is "one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing." *Schmerber*, 384 U.S. at 771, 86 S. Ct. at 1836. An officer is not under a duty to inquire about a defendant's medical history to make this determination. *Johnston*, 336 S.W.3d at 659. Accordingly, the burden is on the defendant to give sufficient notice to the officer that a blood

draw would create an unreasonable medical risk. *See id.* at 659–60. A defendant cannot simply state the name for an uncommon medical condition and indicate that it is associated with fainting—outside the context of a blood draw and without mentioning how it might create a risk of harm in connection with the blood draw— and claim to have carried her burden.

Appellant also relies on her difficulty getting out of the car when she reached the police station as proof that Officer Nunn was put on notice that performing a blood draw would create an unreasonable medical risk. In her affidavit, Appellant asserted that, when she was in the police car, her condition worsened "and I was unable to get out of the police car for about ten minutes. At the jail, I again told the officer of my condition." Even assuming the trial court credited this evidence, claiming that she "told the officer of [her] condition" does not provide any detail of how she described it. Accordingly, this cannot establish that she provided sufficient notice to Officer Nunn.

Officer Nunn testified that, when they arrived at the police station, Appellant said she could not get out because of her low blood pressure. Ten minutes later, she was able to get out of the car. Officer Nunn acknowledged that Appellant told her that her condition could cause dizziness or faintness.

Appellant fails to establish, however, how this establishes that she carried her burden of providing notice that that performing a blood draw would create an

unreasonable medical risk. Dr. Varon testified at the hearing on the motion to suppress and explained that Appellant's dizziness and faintness was caused by her having syncope and that syncope could create some risk with a blood draw. But Appellant fails to show that Officer Nunn had any reason to draw a connection between her occasional dizziness and faintness and an unreasonable medical risk for drawing blood.

This is especially true considering that, after Appellant was placed in a holding cell, she got in a fist fight with another detainee. Appellant did not exhibit any dizziness or faintness during this encounter. Even assuming exhibiting dizziness or faintness should put an officer on notice that performing a blood draw could result in an unreasonable medical risk, Officer Nunn could have reasonably determined that any dizziness or faintness Appellant had been feeling in his car had dispelled.

Finally, there is some question about whether Officer Nunn was under an obligation to report all disclosed medical conditions of the defendant to the person performing the blood draw and, if so, whether such imputed knowledge should have alerted the person performing the blood draw of any unreasonable increased risk in performing the blood draw. We do not need to resolve this question, however. This is because, even assuming Officer Nunn was under an obligation to convey Appellant's disclosed medical conditions to the person performing the

21

blood draw, there is no evidence in the record that the term syncope or the claim that Appellant sometimes faints should have alerted a reasonable person authorized to perform a blood draw about any increased medical risk in performing a blood draw. Accordingly, Appellant has failed to establish that simply stating that she had syncope in the context of a field sobriety test and exhibiting faintness or dizziness in the police car were sufficient to carry her burden of adequately disclosing to the officer or the person performing the blood draw that the blood draw would create an unreasonable risk of medical harm due to an existing medical condition.

We overrule Appellant's first issue.

### Statutory Limitations on Blood Draw

In her third issue, Appellant argues the trial court abused its discretion by denying her motion to suppress the blood-draw evidence because the blood draw was prohibited by statute.

### A. Standard of Review

Matters of statutory construction are questions of law, which this Court reviews de novo. *Williams* v. *State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008). When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent. TEX. GOV'T CODE ANN. § 312.005 (Vernon 2013); *see also Bryant* v. *State,* 391 S.W.3d 86, 92 (Tex. Crim. App. 2012). We begin with

22

the plain language of the statute in order to discern its meaning because we "presume that the legislature meant what it said." *State v. Vasilas*, 187 S.W.3d 486, 489 (Tex. Crim. App. 2006). We further consider statutes as a whole rather than their isolated provisions. *Nguyen v. State*, 1 S.W.3d 694, 696 (Tex. Crim. App. 1999).

**B.      Waiver**

The State argues Appellant has waived this issue because her complaint on appeal is not the complaint she made at trial. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Curiel v. State*, 243 S.W.3d 10, 19 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (holding that argument raised on appeal must comport with specific objection made at trial, or error is waived).

Appellant argued at trial that, pursuant to Chapter 724 of the Texas Transportation Code, "[t]he legislature never intended those accused of first offense DWI, with no aggravating circumstances, to be subject to a search by needle." Appellant argues on appeal that Chapter 724 of the Texas Transportation Code "prohibits a nonconsensual blood draw for a person arrested for misdemeanor DWI in the absence of certain aggravating circumstances set forth in section 724.012(b)."

Both arguments rely heavily on section 724.012 of the Transportation Code. *See* TEX. TRANSP. CODE ANN. § 724.012 (Vernon 2011). Both arguments claim

23

that the State was not permitted to draw Appellant's blood because it was not permitted by Section 724.012. The State argues, however, that Appellant's argument on appeal is different because Appellant also relies heavily on Section 724.013 (which refers exclusively to Section 724.012) on appeal but did not cite it in her motion to suppress at trial. *See* TEX. TRANSP. CODE ANN. § 724.013 (Vernon 2011). We find no merit in this argument.

A party is not required to say magic words or recite a specific statute to preserve an issue. *Bryant*, 391 S.W.3d at 92. Instead, for preservation purposes, the party must simply present the basis of its complaint to the trial court and that same complaint must be presented on appeal. *Id.* Adding more detailed citation to statutory law on appeal does not create an entirely different argument than what was raised at trial. We hold this argument has been preserved.

## C. Analysis

Section 724.012 provides when an officer may and when an officer must obtain a blood or breath in specific cases of suspected intoxication. *See* TEX. TRANSP. CODE ANN. § 724.012. Section 724.013 provides that, except for when an officer must obtain a blood or breath sample, if the suspect refuses to give a blood or breath sample, then "a specimen may not be taken." *See id.* § 724.013; TEX. GOV'T CODE ANN. § 311.016(5) (Vernon 2013) ("'May not' imposes a prohibition and is synonymous with 'shall not'"). Appellant argues that, because she does not

24

fit within any of the circumstances requiring the officer to obtain a blood sample, Chapter 724 rendered her refusal to submit to a blood test into a prohibition on drawing her blood regardless of the presence of a warrant.

As the State points out, the Court of Criminal Appeals held in *Beeman* that Chapter 724 concerns implied consent for breath and blood tests. *Beeman v. State*, 86 S.W.3d 613, 615 (Tex. Crim. App. 2002). The court held in *Beeman* that "if the State has a valid search warrant, it has no need to obtain the suspect's consent." *Id.* That is, "once a valid search warrant is obtained by presenting facts establishing probable cause to a neutral and detached magistrate, consent, implied or explicit, becomes moot." *Id.* at 616. As a result, Chapter 724 is independent of Fourth Amendment search warrant law, not a restriction of it. *See id.* 616 (agreeing with State's argument that construing Chapter 724 to restrict Fourth Amendment search warrant law would be absurd result contrary to statute's intent).

In response, Appellant argues that "the entire analysis in *Beeman* interpreting the implied consent scheme has been called into doubt" by subsequent cases from the United States Supreme Court. *See Missouri v. McNeely*, --- U.S. ---, 133 S. Ct. 1552 (2013); *Aviles v. Texas*, --- U.S. ---, 134 S. Ct. 902 (2014). Regardless of what doubt may have existed about the continuing validity of *Beeman* following *McNeely*, the Court of Criminal Appeals has subsequently affirmed the relevant portion of *Beeman*. In *Villarreal*, the Court of Criminal

Appeals held that, following *McNeely*, "[t]he holding in *Beeman,* that an officer may obtain a search warrant even where implied consent statutes would authorize an involuntary blood draw, remains good law." *State v. Villarreal*, No. PD-0306-14, 2014 WL 6734178, at *20 n.15 (Tex. Crim. App. Nov. 26, 2014). The court held that an officer may obtain a search warrant "even where" Chapter 724 authorizes a mandatory blood draw, not "only where." *See id.* Accordingly, the holding in *Beeman* that an officer is not constrained by consent after obtaining a search warrant remains good law.[5]

We overrule Appellant's third issue.

## Reliability of Blood Test

In her fourth issue, Appellant argues the trial court abused its discretion by allowing the results of the blood test to be admitted because the blood test was unreliable under Rule 702 of the Texas Rules of Evidence. *See* TEX. R. EVID. 702.

## A. Standard of Review

We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). In determining whether the trial court abused its discretion, we consider whether the court acted without reference to guiding rules and principles—that is, whether the

---

[5]    The Court of Criminal Appeals has granted rehearing on *Villarreal*. The State has not challenged in its motion for rehearing the holding upon which we rely. At present, the current holding in *Villarreal* is the strongest indication we have on the Court of Criminal Appeal's perception of the continuing validity of *Beeman*.

26

court acted arbitrarily or unreasonably. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993). We must uphold the trial court's ruling so long as it is "within the zone of reasonable disagreement." *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002).

## B.    Applicable Law

Rule 702 of the Texas Rules of Evidence provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702, 61 TEX. B.J. 374, 392 (Tex. & Tex. Crim. App. 1998, amended 2015).[6] Typically, in order for scientific evidence "to be considered sufficiently reliable as to be of help to a jury," the evidence must satisfy three criteria: "(1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question." *Reynolds v. State*, 204 S.W.3d 386, 390 (Tex. Crim. App. 2006) (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

---

[6]    Effective April 1, 2015, the Texas Supreme Court has adopted amendments to the Texas Rules of Evidence. *See* 78 TEX. B.J. 42, 42 (Tex. 2015). The amendments to Rule 702 were stylistic in nature. *Id.*

In *Kelly*, the Court of Criminal Appeals identified certain non-exclusive factors that are relevant in determining whether the three criteria for scientific evidence have been satisfied. 824 S.W.3d at 573. Appellant argues that, in our review of her challenge to the reliability of the blood draw, we must also consider these factors. This is incorrect in this situation.

In *Reynolds*, the Court of Criminal Appeals held the determination of reliability for a breath test is modified from the standard *Kelly* analysis. 204 S.W.3d at 390. "[T]he Legislature has already determined that the underlying science is valid, and that the technique applying it is valid as long as it is administered by individuals certified by, and using methods approved by the rules of, DPS [the Texas Department of Public Safety]." *Id.* Accordingly, the only determination for a trial court to make in the *Kelly* hearing on a breath test, then, is "whether the technique was properly applied in accordance with the rules of DPS on the particular occasion in question." *Id.* at 391.

For authority that the Texas Legislature had already determined that the underlying science for breath tests was valid, the Court of Criminal Appeals cited Section 724.064 of the Texas Transportation Code. *Id.* at 390 n.26. (citing TEX. TRANSP. CODE ANN. § 724.064 (Vernon 2011)). Section 724.064 provides, in pertinent part, "On the trial of a criminal proceeding arising out of an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle . . . evidence of

28

the alcohol concentration . . . as shown by analysis of a specimen of the person's blood, breath, or urine . . . is admissible."[7] TRANSP. § 724.064.

The statute makes alcohol concentrations established by the person's blood just as admissible as alcohol concentrations established by the person's breath. Accordingly, the same conclusions must be drawn about the validity of blood tests. That is, "the Legislature has already determined that the underlying science is valid . . . ." *Reynolds*, 204 S.W.3d at 390.

As Appellant correctly points out in her motion for rehearing, the Court of Criminal Appeals bases its holding that "the Legislature has already determined . . . that the technique for performing breath tests is valid" on a separate statute. *See id.* at 390 & n.26 (citing *Stevenson v. State*, 895 S.W.2d 694, 696 (Tex. Crim. App. 1995) for proposition "that scientific reliability of intoxilyzer test is established so long as the proponent of evidence of the test results shows that the provisions of what is now Section 724.016 of the Transportation Code were satisfied"). Section 724.016 requires breath test specimens to be taken and analyzed under the rules established by DPS for both analytical methods and qualifications for persons performing the analysis. TEX. TRANSP. CODE ANN. § 724.016 (Vernon 2011). Accordingly, the *Reynolds* court held that the second

---

[7]    Appellant was charged with an offense under Chapter 49 of the Texas Penal Code and the offense involved the operation of a motor vehicle. *See* TEX. PENAL CODE ANN. § 49.04(a).

29

*Kelly* criterion was satisfied as long as the DPS rules had been followed. 204 S.W.3d at 390–91.

Appellant is also correct that there is no corresponding statute in the Transportation Code establishing the reliability of the technique applying the legislatively-approved scientific theory for blood tests.[8] Accordingly, the State retains the burden of showing that the technique applying the scientific theory for blood tests is reliable. As a result, when a defendant challenges the reliability of a blood–alcohol test, the determinations for a trial court to make in the modified *Kelly* hearing is whether the technique applying the theory is valid and whether the technique was properly applied on the occasion in question. *See id.*

We disagree with Appellant, however, that we are required to perform the entire *Kelly* analysis to determine whether the blood test performed in this case—known as headspace gas chromatography—is reliable. "Of course, once a particular type of scientific evidence is well established as reliable, a court may take judicial notice of that fact, thereby relieving the proponent of the burden of producing evidence on that question." *Weatherred v. State*, 15 S.W.3d 540, 542 n.4 (Tex. Crim. App. 2000). "[O]nce some courts have, through a *Daubert/Kelly* 'gatekeeping' hearing, determined the scientific reliability and validity of a specific

---

[8] Section 724.017 of the Texas Transportation Code places certain restrictions on performing the blood draw, but not on the analysis of the blood after the draw is performed. TEX. TRANSP. CODE ANN. § 724.017 (Vernon Supp. 2014).

30

methodology to implement or test the particular scientific theory, other courts may take judicial notice of the reliability (or unreliability) of that particular methodology." *Hernandez v. State*, 116 S.W.3d 26, 29 (Tex. Crim. App. 2003). This applies to the requirement of establishing the validity of the technique applying the scientific theory as well. *Id.*

Headspace gas chromatography is considered a reliable method for testing blood alcohol concentration levels and is generally accepted in the scientific community. *See Bekendam v. State*, 441 S.W.3d 295, 304 (Tex. Crim. App. 2014) (upholding admission of evidence of blood draw based on conclusion that results of gas chromatography tests are widely accepted in the scientific community); *Combs v. State*, 6 S.W.3d 319, 322 (Tex. App.—Houston [14th Dist.] 1999, no pet.), *abrogation on diff. grounds recognized by McGowen v. State*, 25 S.W.3d 741, 745–46 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("Texas and Federal courts have found the gas chromatography test to be a reliable method for identifying compounds, and it has been generally acceptance in the scientific community.").[9]   Because the validity of the technique of headspace gas chromatography for blood tests has been well-established by numerous, previous

---

[9]     *See also Jannah v. State*, No. 01-14-00250-CR, 2015 WL 1544619, at *3 (Tex. App.—Houston [1st Dist.] Apr. 2, 2015, no pet.) (mem. op., not designated for publication).

*Kelly* hearings and appellate reviews, we are not required to repeat this review in this appeal.

Moreover, despite her claims to the contrary, Appellant does not challenge the first two elements of the *Kelly* test in her brief. Her issue concerns whether a variation of the technique for performing the blood test rendered the test unreliable. Appellant casts this as the State establishing a new technique that must be subject to a full *Kelly* analysis. We disagree. The State never claimed that the variation in the technique, discussed further below, was a new or different method. To the contrary, the State conceded the variation was inadvertent. The State's position was that the court could still determine that the technique was properly applied—the third element of the *Kelly* test—because the variation did not affect the reliability of the test.

We agree with the State that a challenge to an inadvertent variance in the technique of performing a blood test requires determining whether the existing technique was properly applied, not whether a new technique has been invented and satisfies the *Kelly* factors. "[T]he third *Kelly* prong—whether the technique was properly applied on the occasion in question—must necessarily be decided on a case-by-case basis." *Somers v. State*, 368 S.W.3d 528, 537 n.27 (Tex. Crim. App. 2012) (citing *Hartman v. State,* 946 S.W.2d 60, 64 (Tex. Crim. App. 1997)). It is this prong that we review in this appeal.

32

When a defendant challenges the reliability of scientific evidence, the State bears the burden at the hearing to establish reliability by clear and convincing evidence. *See Kelly*, 824 S.W.2d at 573; *Schultz v. State*, 457 S.W.3d 94, 103 (Tex. App.—Houston [1st Dist.] 2014, no pet.). This includes challenges to the performance of a test to ensure scientific equipment is functioning properly before the use of the equipment. *See Schultz*, 457 S.W.3d at 103–05 (considering whether moving location of breath alcohol testing van required re-inspection of equipment in van before use). If the State carries this burden, the burden then shifts to the defendant "to establish that the evidence was otherwise unreliable." *Id.* at 105 (citing *Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005)).

**C.      Analysis**

Appellant argues that the blood draw technique was not properly applied because the machine that performed the blood test had not been properly validated. Appellant's blood test was performed on August 23, 2012. About four months earlier, certain components on the machine had to be replaced. Once the components were replaced, the machine had to be revalidated.

For validation, a machine is set at certain parameters. Then samples with the known concentration of alcohol are tested to ensure that the machine is reporting the expected results for the known samples. In the validation process, the machine is evaluated for "linearity, precision, limit of quantification, limit of detection,

33

resolution, carryover, and sample to sample carryover," as indicated in the validation report. As long as the machine produces the expected results for each of these matters at the parameters that were defined, then the machine is validated. The machine then runs its tests for actual specimens using the defined parameters of the validation test.

The record shows that one of the defined parameters for the validation test was that the vial oven in the machine would be set at 70 degrees Celsius (158 degrees Fahrenheit). The record also shows that Appellant's blood test was analyzed with the vial oven in the machine set at 70 degrees Celsius. The record indicates, however, that, for three of the four days of the validation test, the vial oven in the machine was instead set at 60 degrees Celsius (140 degrees Fahrenheit).[10] Appellant argues that, due to the discrepancy in the vial oven temperature during the validation, the machine had not, in fact, been properly validated. She further argues that, because the machine had not been properly validated and because Appellant's blood was tested at a temperature different from what was actually used during most of the validation test, the State failed to carry its burden of showing that the blood draw technique was properly applied.

---

[10] Some question was raised during the hearing about whether the evidence really did show that the vial oven had been incorrectly set at 60 degrees Celsius during the first three days of the validation test. Because we can affirm the trial court's ruling even when we assume that the evidence established the incorrect setting of the vial oven temperature, we do not need to resolve this dispute.

34

Understanding the significance of the discrepancy in the vial oven temperature requires a more detailed explanation of how the machine tests for alcohol in a blood sample. The machine used to test Appellant's blood in this case does not perform tests on the blood itself. Instead, the concentration of alcohol in the blood is tested by measuring the volume of alcohol released into the air under set conditions. Specifically, a portion of the blood sample (a known concentration sample or the sample of the suspect's blood) is placed in a vial along with a set amount of a chemical referred to as n-Propanol. The vial is sealed and placed in a heating chamber, the "vial oven." The liquid solution is heated to the specified temperature. The heating of the liquid solution causes the volatile compounds, such as alcohol, to turn into a gas and form in the remaining portion of the sealed vial, known as the "headspace." The gases in this headspace are tested for alcohol, n-Propanol, and any other relevant chemicals.

According to what is known as Henry's Law, in a closed environment (such as the sealed vial) with a constant temperature, the volume of volatile compounds (such as alcohol and n-Propanol) in a liquid will be proportional to the concentration of those compounds released into the headspace above the liquid. As it applies to blood tests, this law provides that a certain concentration of alcohol in blood will release a predictable, specific amount of alcohol into the headspace of a sealed vial when the blood is heated to a specified temperature, while blood with

twice that concentration of alcohol will release twice the amount of alcohol into the headspace of the vial. For blood tests, the machine measures the presence and quantity of volatiles (such as alcohol and n-Propanol) in the headspace of the vial after the liquid has been heated.

As stated, Henry's Law is based on a fixed, constant temperature. The implication of this law is that, when the temperature of the liquid solution is raised, the concentration of volatiles in the air of the container also increase. If all that were measured were the amount of alcohol in the headspace, then, increasing the temperature on a blood sample would resemble the proportion of alcohol released from blood with a greater concentration of alcohol at a lower temperature.

Arnold provided the most scientifically detailed explanation for why the change in temperature during the validation test did not render the validation useless and, by extension, why the blood draw technique for Appellant's test was properly applied. Arnold acknowledged that, if the machines only tested for the volume of alcohol released into the headspace, an inaccurate reading could result from the change in the oven temperature. But that is not how results are obtained for machines like the one used to test Appellant's blood.

Instead, blood–alcohol concentration is determined by measuring the ratio of the proportion of alcohol contained in the headspace to the proportion of n-Propanol contained in the headspace. The results on the report identifying the

suspect's blood–alcohol concentration is derived from a determination of the ratio of alcohol to n-Propanol, not from a determination of just the amount of alcohol in the headspace.

A set amount of n-Propanol is added to every sample tested, whether the sample is of a known concentration or of the suspect's blood. Based on this, while an increase in the oven temperature would have increased the amount of alcohol released into the headspace, it also would have—based on Henry's Law—released the same proportion of n-Propanol into the headspace. Accordingly, a change in the vial oven temperature would not affect the ratio of alcohol to n-Propanol found in the headspace. It would change the total quantity of both, but not the ratio between the two.

Arnold, Mayor, and Rios also testified that the validation should not be unreliable due to the change in the oven temperature for a similar reason: the tests of the known concentration samples continued to be measured at the expected amount during the subsequent tests, including Appellant's. The purpose of the validation is to ensure that the machine produces results within a permissible range for samples with known concentrations. Arnold, Mayor, and Rios testified that each time a test is performed on a suspect's blood sample, known concentration samples are also tested. If the machine continues to report the expected

37

measurements for known quantity samples during normal use, then the change in oven temperature did not have an impact on its validation.

Appellant's expert, Culbertson, testified to the contrary. She testified that, in order for a machine to produce reliable results, it must be validated first. She asserted that the measurement of controls (known concentration samples) during regular testing could not establish that the machine had been properly validated "[b]ecause you have to have a valid method before you can even speak to the results of a control or a sample." Culbertson did not testify, however, why Arnold's explanation that the ratio of alcohol to n-Propanol would remain constant after increasing the temperature of the vial oven was incorrect.

Appellant's argument on appeal follows the same reasoning. Appellant argues, "If the testimony in this case is sufficiently reliable, then the industry-standard requirements of validation and maintaining documentation are nothing but mere formalities which may be disregarded as long as a lab employee testifies that a method 'has proven itself' by virtue of casework analysis." Appellant's concerns are understandable. Yet, to hold that the trial court abused its discretion by crediting and considering this evidence would be tantamount to holding that any discrepancy in performance of the validation test renders it and all subsequent tests unreliable as a matter of law regardless of any explanation proffered by the State's

expert to show that the discrepancy did not result in any error in the blood test results in question. We cannot hold this.

The trial court's determination of whether the State discharged its burden of establishing that the technique was properly applied includes considering challenges to the performance of tests designed to ensure scientific equipment is functioning properly prior to the use of the equipment. *See Schultz*, 457 S.W.3d at 103–05 (considering whether rules of DPS required re-inspection after van containing breath testing machine had driven to different site). We afford almost total deference to a trial court's determination of questions of fact and its rulings on mixed questions of law and fact when the resolution of those questions depends on an evaluation of credibility and demeanor. *Johnston*, 336 S.W.3d at 657. Nothing in Culbertson's testimony disproved as a matter of law Arnold's testimony that the ratio of alcohol to n-Propanol would remain constant after increasing the temperature of the vial oven. Accordingly, the determination of whether the machine that tested Appellant's blood had been properly validated came down to a resolution of conflicting evidence between experts. This necessarily involves determinations of credibility. As a result, it was within the trial court's discretion to resolve the question in favor of the State. *See id.*

When it ruled on Appellant's challenge to the reliability of the blood test results, the trial court explicitly found that Mayor and Arnold were credible. It

then ruled that the State met its burden on establishing reliability. Appellant has not established that the trial court abused its discretion by admitting the evidence. *See id.*; *Osbourn*, 92 S.W.3d at 537 (holding trial court's admission of evidence is reviewed for abuse of discretion).

We overrule Appellant's fourth issue.

**Modification of the Trial Court Judgment**

The judgment reflects that the trial court's finding on the State's enhancement paragraph was "n/a," meaning "not applicable." This is incorrect.

An appellate court has the authority to reform an error in the judgment when the matter has been called to its attention by any source. *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992) (holding that appellate court could reform judgment to reflect jury's affirmative deadly weapon finding and adopting reasoning in *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) ("The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court.")); *see also Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.) (reforming judgment to correctly reflect appellant's plea). "The Texas Rules of Appellate Procedure also provide direct authority for this Court to modify the trial court's

judgment." *Rhoten*, 299 S.W.3d at 356 (citing TEX. R. APP. P. 43.2(b) (providing that court of appeals may modify trial court's judgment and affirm as modified)).

The record reflects that, the State's amended information contained an enhancement paragraph. During the punishment phase, the trial court found it to be true. Without such a finding, Appellant's sentence would be outside of the permissible punishment range. *See* TEX. PENAL CODE ANN. § 12.21 (Vernon 2011) (setting maximum punishment range for class A misdemeanors at one year), § 12.22 (Vernon 2011) (setting maximum punishment range for class B misdemeanors at 180 days), § 49.04(d) (Vernon Supp. 2014) (setting level of punishment for driving while intoxicated as class A misdemeanor when defendant's blood alcohol concentration is at 0.15 or above). Accordingly we will modify the judgment to correctly reflect the trial court's finding.

## Conclusion

We modify the judgment to reflect that the trial court found the State's enhancement paragraph to be true. We affirm the judgment as modified.

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Huddle.

Publish. TEX. R. APP. P. 47.2(b).

41